**UNDER SEAL**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
FEB 12 2008
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case Number: 1:08mj104 |
| | ) | |
| v. | ) | |
| | ) | |
| GONS GUTIERREZ NACHMAN, | ) | |
| Defendant. | ) | |

Affidavit in Support of a Criminal Complaint

I, Assiya Ashraf-Miller, after being duly sworn, depose and state:

1. I am a Special Agent of the Diplomatic Security Service (DSS) of the U.S. State Department and have been so employed for approximately nine years. I am currently assigned to the Criminal Investigations Division in the Vulnerability Assessment Unit responsible for preventing and investigating consular malfeasance committed by U.S. government employees. I have been trained at the Federal Law Enforcement Training Center, have served at two U.S. embassies, and have completed consular courses at the Foreign Service Institute. As a result of my experience, I am familiar with the duties and responsibilities of a consular officer serving in the Foreign Service, and conducting investigations under Title 18 of the United States Code.

2. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or known by the government. The information provided is based on my personal knowledge and observations, information conveyed to me by other law enforcement officials, and my review of records, documents and other physical evidence obtained during the investigation of this case.

1

3. I present this affidavit in support of a criminal complaint and arrest warrant charging GONS GUTIERREZ NACHMAN with willfully and knowingly misusing his United States Diplomatic Passport in violation of 18 U.S.C. § 1544, making materially false statements in violation of 18 U.S.C. § 1001 and with knowingly possessing film and videotape containing images of child pornography in violation of 18 U.S.C. §2252A(a)(5)(A) and (B). I also present this affidavit in support of an application for search warrants for the apartment where GONS NACHMAN resides, further described in Attachment A to this affidavit and for his vehicle, further described in Attachment C to this affidavit.

## BACKGROUND

4. GONS G. NACHMAN is a naturalized United States citizen born in September 1965 in Costa Rica. He has been employed as a Foreign Service Officer in the U.S. State Department since in or about June 2003. His Foreign Service overseas assignments have been as a Political Officer in U.S. Embassy at Kinshasa, the Democratic Republic of Congo and as a Consular Officer in U.S. Consulates at Sao Paolo and Rio de Janeiro, Brazil.

5. On or about September 27, 2007, NACHMAN was told that his Foreign Service assignment at the U.S. Consulate in Rio de Janeiro, Brazil was curtailed effective immediately due to the U.S. Ambassador's loss in confidence in NACHMAN's ability to carry out his official duties as a Vice Consul amid allegations of criminal activity and misconduct related to the consular process. This misconduct involved allegations of personal relationships with visa applicants at the U.S. Consulate. He was instructed to depart Brazil and report to the U.S. State Department in Washington, D.C., which he did on September 28, 2007. His current residence is at 203 Yoakum Pkwy, Apartment 1217, Alexandria, Virginia 22304. On February 7, 2008,

NACHMAN registered his vehicle, further described in Attachment C, in Virginia, using this address as his personal residence.

6. In accordance with normal practice, on or about October 20, 2007, a packing company called Metropolitan Brazil was contracted by the U.S. Consulate in Rio de Janeiro to pack, coordinate and ship NACHMAN's household effects that were located in his U.S. consulate-provided apartment. It is normal practice for an U.S. embassy or consulate to contract a local packing company in order to transfer an American diplomats' household effects. Metropolitan Brazil provided the U.S. consulate an inventory of the items they packed in NACHMAN's household effects. A review of the inventory reflects there are 85 boxes, many of which contain photos, tapes, documents, and DVDs.

7. On January 15, 2008, the U.S. Consulate in Rio de Janeiro sent an official cable to the U.S. State Department notifying that NACHMAN's household effects have been shipped in a 20-foot container with 85 boxes to arrive at the Port of Baltimore, Maryland aboard a vessel named Libra Salvador. This vessel arrived at Baltimore on or about January 28, 2008.

## FACTS

8. On September 24, 2007, DSS special agents assigned to the U.S. Consulate Rio de Janeiro, Brazil, reported to the DSS headquarters concerning an inappropriate relationship between NACHMAN and a female visa applicant (hereinafter referred to as W1).

9. Subsequent interviews with W1 conducted by special agents uncovered that NACHMAN met W1 in March 2007, on a social networking website called Orkut. W1 stated she met NACHMAN on a beach in March 2007 when she was 17 years old and that NACHMAN

different consular officer. Consulate records further indicate that W1 appealed the decision on September 9, 2007, and was again refused. On September 19, 2007, W1 reapplied for a visa and this time, NACHMAN was the adjudicating consular officer and issued W1 a U.S. student visa. W1 stated during interviews with agents that NACHMAN called her after he issued her the U.S. visa congratulating her and telling her not to tell anyone that she knew him. A review of NACHMAN's cell phone records corroborate that he called W1 the same day after issuing her the visa. W1's home telephone number is also stored on his U.S. consulate-provided cell phone.

13. Investigation reveals the African maid mentioned by W1 was a Congolese female (hereinafter referred to as W2) whom NACHMAN knew from his previous assignment in U.S. Embassy Kinshasa, Congo. Furthermore, NACHMAN misused his official position and title of U.S. Vice Consul to influence the Brazilian government to issue a visa to W2 from the Congo to travel to Brazil. W2 arrived in Brazil to stay with NACHMAN and her Congolese sister who was supposedly his fiancée in his U.S.-consulate provided apartment. NACHMAN a few months later coached and facilitated W2 in filing a false refugee claim in Brazil so she could legally remain in Brazil since her tourist visa had expired. NACHMAN again used his official title of U.S. Vice Consul to sign and affirm the claims W2 made on the refugee petition knowing them to be false. W2 lived with NACHMAN in his U.S. consulate-provided housing in Brazil from on or about September 16, 2006 to April 7, 2007.

14. On October 16, 2007, W2 submitted a written complaint to the U.S. Embassy in Kinshasa, Congo, regarding NACHMAN's behavior and conduct unbecoming of a U.S. diplomat. W2 states while in Rio de Janeiro staying with NACHMAN, she was forced to do household chores, film and photograph NACHMAN having sex with different girls, and that he

5

forced W2 to wash the underwear NACHMAN sometimes had the girls wear during the sexual acts. W2 reported that NACHMAN was seeing females from ages 15 to 29. W2 recounted that NACHMAN told her that he could not go longer than two weeks without sex and that "he would not stop sleeping with girls, no matter what their age, until he died, no matter what the price, even if he had to grant (them) a visa for the United States." On February 12, 2008, W2 reported that NACHMAN would use a digital camera and upload film and photographs onto his personal computer of these sexual acts. She also reported seeing files on this computer with these sexually explicit materials.

15. On November 14, 2007, Special Agent Marc Trahan interviewed W2 in Kinshasa, Congo. W2 stated NACHMAN placed a video recorder on a tripod to tape his sexual activities inside his U.S. consulate-provided apartment in Brazil. NACHMAN told her to take photographs of his sexual activities on approximately 10-15 different occasions. W2 stated that she would be able to identify those females that appeared to be minors.

16. On September 26, 2007, NACHMAN was instructed to cease consular-related activities and to pack his personal belongings from his workspace at U.S. Consulate Rio de Janeiro due to the loss in confidence by the U.S. Ambassador in NACHMAN'S ability to carry out his official duties as a Vice Consul.

16. On September 28, 2007, Special Agent Edward Allen and your affiant interviewed NACHMAN at the U.S. State Department in Washington regarding his assignment curtailment from Brazil. During your affiant's interview with NACHMAN, he admitted to having sexual relationships with two married immigrant visa applicants who he initially met at the U.S. Consulate Rio de Janeiro when he interviewed them as the U.S. Vice Consul assigned to handle

from the Department of Homeland Security since they were prior overstays in the United States. Furthermore, their immigration petitions are based on their marriages to U.S. citizen husbands and NACHMAN's sexual relationship with them could have potentially jeopardized their pending cases with DHS. Interviews with both female applicants reveal that NACHMAN initiated a relationship beyond what was required by his official duties and records reflect that he persistently pursued these female applicants telephonically and by e-mails, despite his position as the U.S. Vice Consul who was personally handling their still pending immigrant visa cases. One female applicant stated NACHMAN took advantage of her and he instructed her that, if questioned, she should deny knowing him personally since he was a career diplomat and did not want to hurt his career.

17. On October 18, 2007, U.S. Magistrate Judge Theresa Carroll Buchanan in Alexandria, Virginia granted your affiant a federal search warrant for NACHMAN's personal America Online (AOL) account. A review of the AOL account reflects several e-mails and photographs between NACHMAN and attractive female visa applicants whom he interviewed and adjudicated as a U.S. Vice Consul in U.S. Consulates Sao Paolo and Rio de Janeiro, Brazil. The account also includes personal and/or sexual photographs of NACHMAN with the two married immigrant visa applicants as well as personal e-mails and photographs unrelated to his official duties with U.S. non-immigrant visa applicants that NACHMAN did not reveal during his interview with your affiant.

18. NACHMAN possesses a tourist and diplomatic United States Passport. As a United States Foreign Service Officer Nachman was issued United States Diplomatic Passport number 900430302 in order to facilitate his authorized travel and for incidental personal travel while at

7

his overseas post. His passport contains the following restriction on its use: "THIS PASSPORT REMAINS THE PROPERTY OF THE UNITED STATES (TITLE 22, CODE OF FEDERAL REGULATIONS, SECTION 51.9) AND IS VALID AS LONG AS THE LEGAL BEARER OR BEARER'S SPONSOR MAINTAINS THE STATUS WHICH CONTINUES ENTITLEMENT TO THE PASSPORT. ANY USE OF THIS PASSPORT FOR TRAVEL OTHER THAN THAT INCIDENTAL TO THE DISCHARGE OF THE BEARER'S OR SPONSOR'S DIPLOMATIC MISSION IS PROHIBITED, AND PUNISHABLE UNDER TITLE 18, UNITED STATES CODE SECTION 1544."

19. While stationed in the Washington, D.C. area, NACHMAN submitted a "Request for Leave or Approved Absence" dated November 19, 2007. This leave slip requested accrued annual leave and sick leave from November 20, 2007 through December 20, 2007. It further requests leave without pay from December 20, 2007 through February 2, 2008. This personal leave was granted the same day.

20. On November 22, 2007, NACHMAN arrived at San Jose, Costa Rica, and presented his official U.S. Diplomatic Passport. He was not on official government travel nor was he otherwise authorized to use his Diplomatic Passport. Once in Costa Rica, NACHMAN traveled to Sao Paulo, Brazil on a connecting flight through Lima, Peru using his Diplomatic Passport without the knowledge of the United States Ambassador to Brazil who had ordered NACHMAN removed. On November 23, 2007, NACHMAN entered San Paulo, Brazil presenting his U.S. Diplomatic Passport.

21. On December 21, 2007, NACHMAN again presented his U.S. Diplomatic Passport when he departed Sao Paulo, Brazil and again when he arrived at San Jose, Costa Rica.

22. While in Costa Rica, on January 3, 2008, NACHMAN and his girlfriend Ana Carolina Pereira Porcher, entered the United States Embassy located in San Jose, Costa Rica. They presented a Nonimmigrant Visa Application seeking the issuance of a tourist visa for NACHMAN's girlfriend from Brazil to enter the United States. This application reflects that she would being staying with NACHMAN for two months at 211 Yoakum Parkway, Apartment 1217, Alexandria, Virginia. The form also reflects NACHMAN as the individual who prepared it and gave this address as his own address. NACHMAN signed the form on January 2, 2008.

24. The United States Vice Consul who interviewed the couple on January 3, 2008, reported that NACHMAN identified himself as a Foreign Service Officer assigned to Brazil. When the Vice Consul asked why the Brazilian National was seeking a visa in Costa Rica and not in Brazil, NACHMAN responded that he is posted in Brazil and was on vacation to Costa Rica with his girlfriend for Christmas. They decided to apply for and obtain the visa to enter the United States while in Costa Rica. The visa was issued in reliance upon these representations.

25. On January 30, 2008, NACHMAN used his U.S. Diplomatic Passport to depart San Jose, Costa Rica in route to the United States.

26. On January 31, 2008, your affiant obtained a federal search warrant for NACHMAN's household effects which had arrived at the Port of Baltimore from United States Magistrate Judge James K. Bredar in Baltimore, Maryland. A search of these effects revealed two camcorder tapes of a 17 year old girl (hereafter W3) made in Congo on or about September 12, 2004. One of these tapes films W3 having intercourse with NACHMAN. Also located among NACHMAN's effects were daily record books for a number of years. In his 2004 book, NACHMAN has three entries reflecting sex with W3. On the first entry for August 24, 2004, he

9

recorded that he had "Delicious Sex" with W3 "(17 years old)." On September 12, 2004, NACHMAN again recorded having sex with W3 along with another identified female. He also wrote: "photos & filming today's events." A VHS videotape was also seized labeled "Congo 2004 Sexual Adventures" which contains footage of NACHMAN having sex with W3 on September 12, 2004, presumably copied from the film described above.

27. W3 has been identified and interviewed in Congo on February 5, 2008. W3 confirmed she was 17 years old when she had sex with NACHMAN in 2004. W3 also provided DSS special agents assigned to the U.S. Embassy Kinshasa, Democratic Republic of the Congo with her student identification card confirming that she was 17 years old at the time NACHMAN made this film. Your affiant has viewed the film and videotape and confirmed that the filming occurred on U.S. government-provided housing to U.S. embassy personnel in the Congo. The film also reflects photographs being taken of the sex. These photographs have not been located among the effects seized pursuant to the federal search warrant of NACHMAN's shipped property to date.

Based on the foregoing facts, it is my belief that NACHMAN has willfully and knowingly misused his United States Diplomatic Passport in violation of 18 U.S.C. § 1544, made materially false statements in violation of 18 U.S.C. § 1001 and knowingly possessed film and videotape containing images of child pornography in violation of 18 U.S.C. §2252A(a)(5)(A) and (B). I also present this affidavit in support of an application for search warrants for the apartment where GONS G. NACHMAN resides, further described in Attachment A to this affidavit, and for his personal vehicle, further described in Attachment C to this affidavit, to seize the items described in Attachment B as instrumentalities and evidence of these criminal offenses. I believe

NACHMAN has a laptop that he took with him when he was removed from Brazil. I have also reviewed various electronic messages that he has drafted since being removed from Brazil discussing this investigation to colleagues communicated via email on the internet during the last several months. NACHMAN does not have a government provided office at this time. Based upon my training and in my experience as a criminal investigator I have learned that Foreign Service Officers keep their property, to include passports and laptops, with them when they are between assignments abroad.

## Conclusion

Your affiant submits, based on the evidence described above, that probable cause exists to believe that a number of federal statutes have been violated, including, 18 U.S.C. 1544 (Misuse of an Official United States Passport), 18 U.S.C. 1001 (False Statements), and 18 U.S.C. 2252A (a)(5)(A) and (B) (Possession and Transportation in Foreign Commerce of Child Pornography).

I further believe that probable cause exists that the premises described in Attachments A and C, contains evidence, fruits, and instrumentalities of the above violations of federal law, which evidence fruits and instrumentalities are further described in Attachment B.

_____
Assiya Ashraf-Miller, Special Agent
Diplomatic Security Service

Sworn to before me this 12th day
of February, 2008 at Alexandria, Virginia

_____/s/_____
John F. Anderson
United States Magistrate Judge

## ATTACHMENT A

The premises to be searched is located at 203 Yoakum Pkwy, Apartment 1217, Alexandria, Virginia 22304, in the Eastern District of Virginia. The location is an apartment on the 12th floor of a sixteen floor high rise apartment building called the Watergate at Landmark. The front door is labeled "1217" marking the apartment number.

## ATTACHMENT B

### ITEMS TO BE SEIZED

All evidence and instrumentalities of violations of federal criminal law as made out in the accompanying affidavit, including 18 U.S.C. 1544 (Misuse of an Official United States Passport), 18 U.S.C. 1001 (False Statements), and 18 U.S.C. 2252A (a)(5)(A) and (B) (Possession and Transportation in Foreign Commerce of Child Pornography) including, but not limited to:

1) Computers, laptop and computer equipment, digital storage devices, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, flash drives, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, computer software, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners in addition to computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, or other visual depictions of such Graphic Interchange format equipment, and the data stored within these materials, which has been used or may be used 1) to visually depict minors engaged in sexually explicit conduct and/or child erotica; 2) to advertise, transport, distribute, receive, collect and possess visual depictions of minors engaged in sexually explicit conduct and/or child erotica; 3) to run and operate a file-server and 4) to show or evidence a sexual interest in minors or desire or motive to collect or distribute visual depictions of minors engaged in sexually explicit conduct of further commit the offenses listed above.

2) Records, documents, writings, and correspondence with others pertaining to the possession, receipt, distribution, transportation or advertisement of visual depictions of minors engaged in sexually explicit conduct.

3) Any and all photographs, compact disks, DVDs, motion picture films (including but not limited to 8mm film), super 8 video, video cassette tapes, production and reproduction equipment, motion picture cameras, video cameras, video cassette recorders, and other photographic and video recording equipment used to produce or reproduce photographs, motion picture films, or video cassettes, cameras, documents, books, records, ledgers, correspondence, receipts, magazines and other materials reflecting the purchase, sale, trade, transmission, advertising,

14

transport, distribution, receipt and possession of any visual depiction of minors engaged in sexually explicit conduct or to show or evidence a sexual interest in minors or desire or motive to collect, distribute, and receive visual depictions of minors engaged in sexually explicit conduct.

4) Any and all magazines, books, photographs, letters, written narratives and computer text files or any other printed or electronic matter to show or evidence a sexual interest in minors or desire or motive to advertise, distribute, transport, receive, collect or possess visual depictions of minors engaged in sexually explicit conduct.

5) Any and all records showing or bearing indicia of the use, ownership, possession, or control of the residential/business premises described as and items contained therein, including visual depictions of minors engaged in sexually explicit conduct, computer equipment, accessories, telephone(s), modems(s), or such records, whether stored on paper, in files, invoices, bills, leases, deeds, permits, licenses, telephone bills, tax receipts, or other documentation, or on magnetic media such as tape, cassette, disk, diskette or on memory storage devices such as optical disks, or storage media.

6) Envelopes, letters, and other correspondence, including, but not limited to, electronic mail, chat logs, IRC logs, ICQ logs, all usage records for distributed file sharing technologies, and electronic messages, offering to distribute and receive visual depictions of minors engaged in sexually explicit conduct, or to show or evidence a sexual interest in minors or desire or motive to advertise, distribute, transport, receive, collect and possess visual depictions of minors engaged in sexually explicit conduct.

7) Records or other items which evidence ownership or use of computer equipment found in the above residence, including, but not limited to, correspondence, sales receipts, and bills for Internet access relating to Verizon or any other Internet service provider, all handwritten notes and handwritten notes in computer manuals.

8) Keys, storage combinations, computer passwords, computer data security devices and computer related documentation which indicate any other storage containers or facilities that could contain evidence of collection, advertising, transport, distribution, receipt, or possession of child pornography.

9) All software, manuals, documents or records relating to the operation of or use of computers or internet components.

10) Any and all documents pertaining to the U.S, government or foreign government, such as: visas and visa applications, diplomatic and tourist passports and passport

applications, immigration applications, petitions in or outside the U.S., or for foreign governments as well as his U.S. government identification card.

11) Personal telephone books, business cards, or telephone bills.

12) Daily planners and any other written record of daily activities as well as any photographs and record of the purpose of travel in 2007 and 2008.